UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | |
|---|---|
| BUSTER CARTER, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| V. ) | |
| ) | Civil Action No. 0: 16-017-DCR |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     Defendant, ) | |

*****    *****    *****    *****

and

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | |
|---|---|
| CAROLYN GRIFFITH, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| V. ) | |
| ) | Civil Action No. 7: 16-101-DCR |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     Defendant, ) | |

***    ***    ***    ***

## MEMORANDUM OPINION AND ORDER DENYING INJUNCTIVE RELIEF

These matters are pending for consideration of Plaintiff Buster Carter's [Record No. 13] and Plaintiff Carolyn Griffith's [Record No. 15] motions for preliminary injunctions. A joint hearing in these cases was held on August 29, 2016, followed by additional briefing. The

matters are now ripe for review. For the reasons discussed below, both motions will be denied.[1]

## I. BACKGROUND

Plaintiff Carter is a resident of Lawrence County, Kentucky. Prior to his application for disability benefits, Carter worked for 10 years as a coal miner and approximately 20 years as a truck driver. [Ashland Civil Action No. 0: 16-017; Record No. 4] After being denied Social Security Disability Insurance benefits ("DIB") in a January 29, 2009 application, Carter submitted new medical evidence and requested a hearing on April 27, 2010. [Ashland Civil Action No. 0: 16-017; Record No. 7-1, Attachment 1] No hearing was held, however. Instead, Carter's application was approved in a fully-favorable, on-the-record decision dated August 3, 2010. The decision found Carter to have been disabled since November 22, 2008. Carter was represented in the latter action by attorney Eric Conn, and the new medical evidence was submitted by Dr. Frederic Huffnagle, M.D. (now deceased). Administrative Law Judge ("ALJ") David Daugherty reviewed Carter's case and issued the on-the-record decision. Conn, Huffnagle, and Daugherty have been implicated in a scheme to defraud the Social Security Administration. That scheme is the basis for the present controversy.

---

[1] On April 1, 2016, a federal grand jury returned an indictment against Eric Conn, David Daugherty, and Alfred Adkins. [See Lexington Criminal Action No. 5: 16-22-DCR.] The indictment contains 18 substantive counts and several additional forfeiture counts. The counts are related to allegations of fraud that are discussed in this Memorandum Opinion and Order. The criminal action has been deemed to be complex with a trial scheduled in 2017. The criminal action is pending before the undersigned.

On June 1, 2016, a criminal information was filed before the undersigned, charging former Administrative Law Judge Charlie Paul Andrus with conspiring with Eric Conn and others to retaliate against individuals who had provided information relating to the alleged fraudulent scheme. [See Lexington Criminal Action No. 5: 16-56-DCR.] Defendant Andrus entered a guilty plea at the time the information was filed.

Plaintiff Griffith resides in Pike County, Kentucky. She was awarded Supplemental Security Income benefits ("SSI") on July 31, 2008, based on a finding that she had been disabled since February 8, 2008. In her application for SSI benefits, Griffith was represented by attorney Conn. She received a fully favorable on-the-record decision by ALJ Daugherty, which relied on medical evidence submitted by Dr. Bradley Adkins, Ph.D. As noted in footnote 1 above, Adkins also is charged in the scheme to defraud the Social Security Administration ("the Agency").

### a. The Commissioner's Authority

In 1994, Congress amended the Social Security Act ("the Act") to streamline the process by which the Agency can terminate benefits if there is reason to believe fraud was involved in the application for those benefits. Specifically, Congress added sections 205(u), 1129(l), and 1631(e)(7) to the Act [42 U.S.C. §§ 405(u), 1320a-8(l), 1383(e)(7)], to require immediate redetermination of benefits under such circumstances. *See* Pub. L. No. 103-296, § 206(d), the Social Security Independence and Program Improvements Act of 1994, 108 Stat. 1464, 1514. The legislative history suggests that Congress was displeased with the amount of time taken by the Agency to terminate disability benefits in cases of suspected fraud.[2] The delay was attributed, in part, to the "cumbersome and unworkable"[3] nature of the process used to reevaluate benefits in such instances, commonly known as the "reopening" procedure.

---

[2]     140 CONG. REC. H4750-03, 1994 WL 274789 (daily ed. June 21, 1994) (statement of Rep. Santorum).

[3]     STAFF OF SUBCOMM. ON OVERSIGHT OF THE H. COMM. ON WAYS & MEANS, 103RD CONG., REP. ON REFORMS TO ADDRESS SUPPLEMENTAL SECURITY INCOME FRAUD AND ABUSE INVOLVING MIDDLEMEN 7 (Comm. Print 1994) *available at* http://congressional.proquest.com/legisinsight?id=CMP-1994-WAM-0010&type=PRINT.

Reading the statutory language to require a process distinct from the already existing reopening procedure, the Commissioner established a framework for handling these redeterminations, consistent with authority prescribed in sections 205 and 1631 of the Act, 42 U.S.C. §§ 405, 1383.[4]  This framework was established through Social Security Rulings and internal guidelines.  Social Security Rulings do not have the force of law, but they are binding on all components of the Agency, as provided by 20 C.F.R. 402.35(b)(1).  The Agency's internal manual for adjudicating claims, the Hearings, Appeals and Litigation Law Manual ("HALLEX"), is published by the Deputy Commissioner for Disability Adjudication and Review.  *See* HALLEX I-1-0-1 (available at https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html).  HALLEX guidelines, like Social Security Rulings, do not have the force of law.  *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008).

The current rulings interpreting sections 205(u), 1129(l), and 1631(e)(7) of the Act are 16-1p, 81 Fed. Reg. 13436, and 16-2p, 81 Fed. Reg. 13439.  These rulings went into effect on March 14, 2016, after the plaintiffs' redetermination hearings were held.[5]  The ruling in effect

---

[4]     Section 205(a) states:

> The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this title, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

[5]     Carter's redetermination hearing was held on September 29, 2015.  The ALJ's decision was issued on November 4, 2015.  Review by the Appeals Council was denied on December 15, 2015.  Griffith's hearing was held on February 1, 2016.  The ALJ's decision was issued on February 22, 2016.  Review by the Appeal Council of this decision was denied on March 21, 2016 (after the new rulings took effect).

on the dates of the plaintiffs' redetermination hearings was 00-2p, 65 Fed. Reg. 10140 (effective 02/25/2000). The HALLEX guidelines applicable to redeterminations are found at subsection I-1-3-25 (updated February 25, 2016). The previous version of HALLEX I-1-3-25, updated as provided in Transmittal I-1-83 (https://www.ssa.gov/OP_Home/hallex/TS/tsi-1-83.html), was submitted to the Court in compliance with the September 8, 2016 order. [Pikeville Civil Action No. 7: 16-101; Record No. 31]

### b. Conn Cases

According to letters provided as exhibits to the motions to dismiss, on July 2, 2014, the Office of the Inspector General ("OIG") sent notice pursuant to §1129(l) of the Act, 42 U.S.C. § 1320a-8(l). The notice referred 1,787 applications, all involving attorney Conn, for which it had reason to believe fraud was involved. [Ashland Civil Action No. 0: 16-017, Record No. 7-1, Attachment 2] For reasons not stated in the record, this initial referral was with the understanding that no adverse action would be taken against any of the individuals on the list, until further notice. *Id.*

On May 12, 2015, the OIG notified the Commissioner that there were no objections "to [the Agency] moving forward with its administrative processing of the redeterminations of the 1,787 individuals whose names were previously provided by OIG to [the Agency] on July 2, 2014." [Ashland Civil Action No. 0: 16-017; Record No. 7-1, Attachment 2] Six days later, the plaintiffs were notified by the Agency that there was reason to believe fraud or similar fault was involved in their applications for benefits. Via letters captioned "Notice of Appeals Council Action," the Agency informed the plaintiffs that, pursuant to this notification, it was required to redetermine their benefits under sections 205(u) and 1631(e)(7) of the Act, 42 U.S.C. §§ 405(u), 1383(e)(7). The notice explained that, as part of the redetermination, the

Agency was not permitted to consider evidence submitted by any of the four physicians believed to have been involved in the alleged fraud. The letters also informed the plaintiffs that, having undertaken the redetermination, a preponderance of the non-disregarded evidence did not support their previous disability finding. Because of this conclusion by the Appeals Council, the Agency planned to set aside their favorable decisions and send their cases back to a new ALJ for further consideration and issuance of a new decision. The plaintiffs were given 10 days to submit additional evidence to the Appeals Council before their cases would be sent to a new ALJ. The record reflects that Griffith was granted a 30-day extension.

Both cases were then remanded to new ALJs for new hearings, and the plaintiffs were permitted to submit further evidence to the ALJ prior to the new hearings. Griffith attended her new hearing together with counsel, and Carter attended his hearing without counsel. In each case, the ALJs found insufficient evidence to support the initial disability determinations. The plaintiffs then submitted their cases to the Appeals Council, which declined to reconsider the ALJs' decisions. These denials constituted final agency action. Carter and Griffith filed their present actions as provided by §405(g).[6]

Carter and Griffith have filed motions for preliminary injunctions, seeking to prevent the termination of their benefits during the pendency of these actions. The record is not clear regarding the date either Carter or Griffith stopped receiving benefits payments. However, as of the August 29th hearing, payments had ceased for each plaintiff.

---

[6] The right of appeal in Title XVI cases is provided by §1383(c)(3). This statutory section expressly adopts the §405(g) standards.

## II. THE APPLICABLE STANDARD OF REVIEW

Preliminary injunctions are "extraordinary and drastic remed[ies] . . . never awarded as of right." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren,* 553 U.S. 674, 689–90 (2008)). A plaintiff seeking injunctive relief must show, either individually or in combination, that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor, and; (4) issuance of injunctive relief is in the public interest. *Platt*, 769 F.3d at 453 (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). In considering the appropriateness of an injunction, the court balances these four factors. *Id. See also Am. Civil Liberties Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015); *Bays v. City of Fairborn,* 668 F.3d 814, 818–19 (6th Cir. 2012). In addition, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (quoting *Gonzales v. Nat'l Bd. of Med. Examiners,* 225 F.3d 620, 625 (6th Cir. 2000)). While a plaintiff need not prove his or her case in full to obtain injunctive relief, the proof necessary "is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

During the August 29th hearing, counsel for the Commissioner argued that, because benefits payments have terminated, the plaintiffs are seeking mandatory rather than prohibitory injunctions. While this assertion is technically correct, it is of no real consequence here. Under applicable Sixth Circuit authority, this distinction has no bearing at the preliminary injunction stage. The Sixth Circuit has expressly rejected the assertion that the standard for a mandatory

injunction is higher than for a prohibitory injunction.[7]  In *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, the court held that "the difference between mandatory and prohibitory injunctive relief does not warrant application of differing legal standards."  163 F.3d 341, 348 (6th Cir. 1998) (noting disagreement with the Tenth Circuit's heightened "heavy and compelling" standard).  *See also NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 935 n.2 (6th Cir. 2007) (unpublished opinion).  *United Food & Commercial Workers Union* drew from the logic of *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir. 1978), which points out that "the purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  573 F.2d at 925.  While a preliminary injunction is often explained as meant to preserve "the status quo," *Stenberg* explained that there is no "particular magic" to that phrase.  *Id.*  Instead, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury."  *Id.*

Here the parties seek to prevent the injury they allege will inevitably flow from the loss of their benefits payments.  Despite the fact that plaintiffs' desired remedy would require a mandatory injunction, the first factor of the test for injunctive relief remains a substantial likelihood of success on the merits.

---

[7]     *See, e.g., Carabillo v. ULLICO Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49, 53 (D.D.C. 2004) ("[W]hen a party seeks a mandatory injunction, *i.e.,* to change the status quo rather than to preserve it, the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.") (quoting *Columbia Hospital for Women Foundation, Inc. v. Bank of Tokyo–Mitsubishi, Ltd.,* 15 F.Supp.2d 1, 4 (D.D.C. 1997) (citations and internal quotation marks omitted)).

### III.   LEGAL ANALYSIS

### a.   The Likelihood of Success on the Merits

The plaintiffs allege various grounds for relief, including violations of the Due Process Clause of the Fifth Amendment, violations of the Social Security Act, and violations of the Administrative Procedures Act.  Plaintiff Carter also alleges a violation of the Equal Protection Clause, although he does not raise this claim in his motion for a preliminary injunction.

### i.      The Due Process Claims

The plaintiffs argue that, by not having been given adequate notice of the fraud allegation and by not having been given the opportunity to challenge that allegation, their due process rights have been violated.  Apart from the general allegations against Conn, Daugherty, Adkins and Huffnagle, it is true that the plaintiffs have not been presented with evidence of fraud specific to their applications.   It is also correct that the plaintiffs were given no opportunity to rebut the fraud allegation imputed to their benefits applications.

To prevail on their due process claim, the plaintiffs must show they were entitled to the evidence of fraud and an opportunity to rebut it.  *Matthews v. Eldridge*, 424 U.S. 319 (1976), established a three factor test for determining the process that is required before the deprivation of a protected right.  The test evaluates the interest at stake, the risk of erroneous deprivation of such interest, any substitute procedural safeguards which are available, and the government's interest, including the administrative burden of such procedural safeguards.   In light of the procedural protections already in place, the plaintiffs have not shown a high risk of erroneous deprivation of disability benefits.  Likewise, they have not shown that additional safeguards (namely, a hearing on the alleged fraud) will have probative value that outweighs the burden such a process would impose on the statutorily-mandated redetermination process.

## 1. The Plaintiffs' Arguments

Plaintiffs Carter and Griffith present identical arguments, contending that the redetermination process violates due process.[8] They argue that, because the Agency has not disclosed evidence proving fraud or similar fault was involved in either of their specific awards of benefits, they have been deprived of benefits "based on a secret document containing allegations of fraud." [*See* Ashland Civil Action No. 0: 16-017, Record No. 13, p. 5; and Pikeville Civil Action No. 7: 16-101, Record No. 15-1, pp. 6-7.] Along with this alleged withholding of evidence, the plaintiffs state that they have not been given the opportunity to challenge the allegation of fraud, until the present litigation. *Id.* The crux of their due process claim is that, because the fraud allegation is the fact upon which the redetermination and termination of benefits was based, the evidence of fraud must be disclosed and they must have the opportunity to challenge that evidence. In support, they cite the admonition of *Goldberg v. Kelly* that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show

---

[8]  Griffith further argues that, as a Title XVI recipient, she is entitled to heightened protection. Under *Tatum v. Mathews*, 541 F.2d 161 (6th Cir. 1976), Title XVI recipients are generally entitled to pre-termination evidentiary hearing even where Title II recipients are not. But *Tatum* does not have a direct bearing here because the matter at issue is not whether a pre-termination hearing must take place (it did for both plaintiffs) but what evidence can be submitted and what evidence may be rebutted at that hearing. *Eldridge* remains good law for the basic test of determining the process that is due. While it may be that SSI recipients are generally entitled to greater protection because their benefits are based on financial need, that fact alone is not sufficient to alter the bottom-line result as it relates to the ability to challenge the fraud allegation.

that it is untrue." 397 U.S. 254, 270 (1970).  Additionally, "due process requires an opportunity to confront and cross-examine adverse witnesses."  *Id.*

## 2.  The Due Process Test

Due process is not a fixed concept.  Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  *Mathews v. Eldridge*, 424 U.S. 319, is the seminal case for determining the requirements of due process.  *Eldridge* involved a Title II beneficiary whose benefits were terminated after a routine reevaluation of his disability.  The plaintiff, George Eldridge, was entitled by Agency policy to a hearing, but the hearing was not provided until after his benefits were terminated.  Eldridge argued that due process required a hearing *prior to* the termination of his disability benefits.  In support, Eldridge cited *Goldberg v. Kelly*, 397 U.S. 254, which held that welfare beneficiaries have a right to an evidentiary hearing prior to termination of their welfare benefits. 424 U.S. at 325.

In evaluating Eldridge's claim, the Court acknowledged that disability benefits were a statutorily-created property interest.  424 U.S. at 332.  Therefore, an individual's continued receipt of such benefits was protected by the Fifth Amendment.  *Id.*  The Court explained that such Fifth Amendment protection included "the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction."  *Id.* at 333 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring) (internal quotation marks omitted)).  More to the point, the Court acknowledged that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

After outlining the basic due process framework, the *Eldridge* Court discussed the process that is required before any deprivation may occur.  It noted that in only one case (i.e., *Goldberg v. Kelly*) had the Court held that "a hearing closely approximating a judicial trial" was necessary. 424 U.S. at 333.   As one example of a lesser requirement, the Court cited *Bell v. Burson*, 402 U.S. 535 (1971), which concluded that a probable-cause determination was sufficient prior to the suspension of a driver's license.  Illustrated by these examples, the Court reiterated the holdings of *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), and *Morrissey v. Brewer*, 408 U.S. at 481, that due process is not a technical conception with fixed content, but is flexible and situationally-dependent.  To determine what is required in particular circumstances, the *Eldridge* Court set out the following three factor test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334–35.

Applying the above test, the Court found that Eldridge was not entitled to a pre-termination hearing.  Regarding the first factor, it held that, because he would be awarded full retroactive relief if he ultimately prevailed, his sole interest was in the "uninterrupted receipt of the source of his income pending [a] final administrative decision on his claim." *Id.* at 340. The Court noted that, unlike in *Goldberg* where welfare benefits were tied to financial need, Eldridge's Title II benefits were not.  *Id.* at 341.  Despite the possibility that the "hardship imposed upon the erroneously terminated disability recipient may be significant," the Court held that this was not enough to warrant a full evidentiary hearing. *Id.* at 342-43.

Regarding the second factor, the Court looked to what process was currently in place. It noted, that unlike in *Goldberg*, where a wide variety of information was relevant to the welfare determination, the disability determination was based on "routine, standard, and unbiased medical reports by physician specialists." *Id.* at 344 (internal citations omitted). Next, regarding safeguards in place, the Court identified the policy of allowing the recipient full access to all of the information the state agency relied upon. *Id.* at 345-46.

Finally, the Court looked at the public interest, including the administrative burden and costs of providing a pre-termination evidentiary hearing in all cases, as of right. *Id.* at 347. The Court held that, while the "[f]inancial cost alone is not a controlling weight," these costs would not be insubstantial, and at some point, the cost of more safeguards for those thought undeserving will "come out of the pockets of the deserving." *Id.* at 347-48.

Ultimately, the Court held that, more important than the "ad hoc weighing of fiscal and administrative burdens against the interests of a particular category of claimants" was the determination of "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348. Because, in the "wise admonishment of Mr. Justice Frankfurter," the "differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.'" *Id.* (quoting *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 (1940)). In light of these considerations, the administrative procedures in place which did not provide an evidentiary hearing prior to termination fully comported with due process. The *Eldridge* test has been used broadly over the past decades, and applies here in evaluating whether the redetermination process afforded plaintiffs comported with due process. *See Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 620

(6th Cir. 2010) (applying *Eldridge* to determine whether a social security hearing "passes constitutional muster").

Before evaluating whether due process requires a hearing on the fraud allegation, the Court must first consider the role of the fraud allegation in the termination of plaintiffs' benefits. Under sections 205(u) and 1631(e)(7) of the Social Security Act, the fraud allegation had two effects. First, it triggered a redetermination of benefits. Second, it established a rule that any evidence related to the alleged the fraud is to be disregarded during the redetermination.

### A. The First *Eldridge* Factor: Private Interest

As outlined above, the private interest that will be affected by the official action is the first factor to be considered. This factor has two parts: nature and scope. Regarding scope, the interest at stake in *Eldridge* was the temporary deprivation of benefits pending further agency action. Here, plaintiffs are faced with final agency action. Final action should normally weigh in favor of greater procedural protection. However, the reality of Griffith's and Carter's situations demonstrates that "final" does not mean without further options.

Griffith remains eligible and, in fact, has reapplied for Title XVI benefits. In addition, she has applied for a waiver of her overpayment. If both applications are granted, benefits will be restored and the only interest remaining is retroactive payment of lost benefits. However, the record does not indicate a time frame for decisions on these applications.

Carter, a Title II recipient without adequate employment to requalify, cannot reapply for the DIB benefits. But the record suggests that Carter now qualifies for Social Security retirement benefits. [Ashland Civil Action No. 0: 16-017, Record No. 1-1, p. 3; statement of Counsel for Commissioner at August 29, 2016 hearing] As represented by counsel for the

-14-

Agency, if Carter applies for a waiver of overpayment, his retirement benefits will resume during the pendency of the waiver determination. And if the overpayment waiver is ultimately approved, Carter will suffer no ongoing harm. Importantly, one of the factors for waiver of overpayment is whether the beneficiary was at fault for the overpayment. *See* 42 U.S.C. §404(b). That is, as stated in SSR 16-1p, the Commissioner considers whether the claimant bears individual responsibility for the overpayment, in determining whether to grant a waiver. The Commissioner, therefore, would need specific evidence that a plaintiff was at fault for the overpayment to deny a waiver.[9]

The record does not reflect whether hearings are provided when former beneficiaries apply for waivers. However, Griffith cites *Califano v. Yamasaki*, 442 U.S. 682, 696–97 (1979), for the proposition that claimants are entitled to an oral hearing on fraud allegations before they may be held at fault for an overpayment. [Pikeville Civil Action No. 7: 16-101; Record No. 32, p. 11] While *Califano* is inapposite to whether plaintiffs should receive a hearing on fraud prior to the redetermination (where no fraud is being imputed on them), its holding is applicable as relates to plaintiffs' applications for waivers. Unlike the circumstance presented here, where the redetermination process requires no specific finding of fraud or similar fault on the part of the beneficiaries themselves (and is based on other evidence), [10] the

---

[9]    Counsel for the Commissioner represented during the hearing in the related *Perkins* case, Pikeville Civil Action No. 7: 16-035, that the Agency currently has no such evidence of individual fault for any of the *Conn*-related plaintiffs.

[10]    While the finding of fraud is a predicate fact without which their termination of benefits would not have occurred as it did, a "but for" cause to use the language of tort law, it is not the proximate cause of the termination. The proximate cause of the termination was the lack of sufficient evidence, outside the evidence deemed tainted, to support the finding of disability.

waiver provision seems to turn on such evidence. Such a hearing would substantially narrow (if not moot entirely) the present case as it relates to Carter. And if Griffith were legitimately eligible for Title XVI benefits in 2008 due to an intellectual disability, she likely remains eligible on reapplication. If she is awarded benefits on a new application, she will be in the same position as Carter, meaning a hearing on her entitlement to a waiver would substantially provide the relief she seeks. Regardless of whether the above possibilities come to pass, there exists a present gap in coverage for both plaintiffs during which no retroactive payment will be made. As a result, the plaintiffs retain an interest in the value of these lost payments.

Regarding the nature of the interest, Plaintiff Carter is a Title II recipient. As discussed in *Eldridge*, financial need is not a consideration for Title II recipients. Griffith, on the other hand, is a Title XVI beneficiary, meaning financial need is required to qualify. Under *Eldridge*, the Court looked at financial need for considering the degree of hardship caused by a deprivation as well as for determining the complexity of making an eligibility determination. Regarding hardship, Griffith's SSI benefits were not her only source of household income.[11] And with regard to complexity, her qualification for benefits was questioned regarding medical evidence, not the complex financial need calculation as in *Goldberg*. Because her financial status is not the basis upon which her SSI benefits have been revoked, this factor is not included in determining the risk of erroneous deprivation of benefits.

In summary, there exists an interest (namely, those payments now forgone) for which both plaintiffs will receive no relief absent success in this action. However, given the possible

---

[11]     As stated during the hearing on the plaintiffs' motions for injunctive relief, Griffith resides with her daughter and a disabled sister, both of whom have independent sources of income. Furthermore, Griffith has begun receiving food stamps.

substitute sources of income that may be available, the first factor does not weigh strongly in favor of finding the plaintiffs entitled to the relief they seek.

### B. The Second *Eldridge* Factor:  The Risk of Erroneous Deprivation

The second factor for the Court's consideration is the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards.  The risk of erroneous deprivation must be evaluated in light of the procedural protections in place.

During the redetermination process, the Agency examines all of the evidence considered at the time of the original award, with the exception of evidence related to the alleged fraud.  In Carter's and Griffith's cases, this means medical evidence submitted by Drs. Huffnagle and Adkins.  Individuals subject to the redeterminations are entitled to submit new evidence, as long as the evidence relates to the time period of the original award.  In fact, individuals have two separate opportunities to submit new evidence.  First, new evidence may be submitted after the initial notification, before the Appeals Council remands the case to an ALJ.  If this evidence is not sufficient to change the determination of the Appeals Council, the case is then remanded for a new ALJ hearing.  Individuals are then entitled to submit further evidence prior to their hearing before the new ALJ.  Additionally, the Agency will assist beneficiaries in obtaining and developing new evidence, when requested.

The greatest "risk of erroneous deprivation" comes from the possible difficulty of acquiring new medical evidence to prove a disability that may have existed over five years ago.  Such a task may be particularly burdensome, considering that medical record retention practices often result in such records being destroyed within that time frame.  However, as stated above, the Agency will consider newer records that provide backward-looking evidence

of disability. The Agency's assistance in obtaining new evidence of disability is reassuring, considering that patients may show present characteristics that demonstrate a long-existing condition.

When considering the risk of erroneous deprivation, the Court must also consider the nature of the evidence ignored. Neither Drs. Huffnagle nor Adkins were the plaintiffs' treating physicians. The testimony of non-treating physicians is, by rule, not given heavy weight in applications for benefits. If ALJ Daugherty was violating internal policy in his approval and gave this evidence more weight than it deserved, then a new redetermination is likely to produce a different result, regardless of whether that evidence is ignored. Further, it is alleged that ALJ Daugherty was not simply giving the evidence from these non-treating physicians improper weight, but that he was not weighing the evidence at all. Simply put, he accepted these physicians' opinions at face value. The duty of an ALJ is to weigh the evidence, not accept it at face value. The risk of "erroneous deprivation," therefore, is low because the evidence being ignored is not entitled to great (much less controlling) weight.

The substitute or additional procedures proposed by plaintiffs would allow a hearing on whether the evidence should be excluded. Because the statute requires the Agency to disregard any evidence that is believed to be fraudulent, such a hearing would include a determination of whether there is reason to believe fraud existed. Evaluating the probative value of such a procedure means considering who might be subpoenaed to testify, and who would bear the burden of proof. It seems the government would have to show by a preponderance of evidence that fraud existed, and the plaintiffs would have to rebut that showing. Given that there is evidence sufficient for a criminal indictment, the government would be able to establish the likelihood of fraud. However, it is quite unlikely that the

plaintiffs could succeed in rebutting such a showing where their potential witnesses are under criminal indictment. In truth, there need be no specific showing that fraud existed in a particular plaintiff's case if there is sufficient evidence demonstrating a conspiracy among the key actors in their disability determination. Additionally, any evidence plaintiffs may present to show they were properly eligible for disability benefits would not be relevant to whether fraud was involved.

In theory, the substitute safeguard proposed by the plaintiffs would have substantial probative value because, if a plaintiff is able to refute the reason to believe fraud or similar fault was involved, then the redetermination process would be unnecessary. Without reason to believe there was fraud, the plaintiffs would not only be entitled to use the excluded evidence, they could avoid the redetermination altogether.

In reality, however, the probative value of a hearing on the fraud will be of negligible value. The plaintiffs' interest is in the retention of their disability benefits, not in avoiding the redetermination. While a successful rebuttal of the fraud allegation would seem to ensure continued receipt of benefits (notwithstanding other avenues Agency has available for reopening or redetermination), the inability to rebut the allegation does not compromise the plaintiffs' right to prove they were legitimately eligible for benefits. In short, while proper entitlement to benefits is irrelevant to the fraud allegation, it is wholly relevant during the redetermination proceeding. When it comes to the actual probative value of a fraud hearing on the plaintiffs' ability to retain their benefits, the reality is that it will be relatively meaningless at this stage.

### C. The Third *Eldridge* Factor: The Government's Interest

The third factor for consideration is the government's interest, including the function involved and the financial and administrative burdens that the additional or substitute procedural safeguards would entail. As an initial matter, such additional procedures would seem to undermine the swift termination of benefits that was the purpose of the redetermination process. However, such a burden matters little if it is necessary for due process by eliminating the risk of erroneous deprivation of benefits (erroneous deprivation was, of course, not the intent of the statute). In reality, as mentioned above, such hearings would likely be of minimal value to a plaintiff's ultimate ability to retain benefits. However, this procedure could likely require substantial time and interfere with ongoing criminal prosecutions.

The Agency does not allege, at this stage, that the plaintiffs had knowledge of or were involved in the fraudulent conduct alleged. Criminal prosecutions are ongoing for those allegedly responsible for the underlying fraud. Part of the allegation of fraud is that the physicians were signing pre-completed residual functional capacity forms. The Agency may not have proof of fraud in each particular circumstance, but neither does it wish to deprive deserving individuals of benefits to which they are rightfully entitled. Congress decided to strike the balance by requiring a redetermination that disregards fraudulent evidence, and the Agency developed processes through which beneficiaries may submit new evidence to supplement their dated application, and may receive assistance in doing so. The United States has undertaken criminal proceedings where warranted. To require a full-fledged judicial-type hearing on the fraud in this this administrative context would frustrate the ability of the redetermination process to operate. Requiring the Commissioner to obtain the relevant evidence from the OIG, and present it to each individual defendant could also risk compromising the criminal prosecutions.

Additionally, as mentioned above, a beneficiary's actual entitlement is no defense to the fraud allegation. It is quite possible (in fact, proven to be the case by the number of beneficiaries deemed to be properly entitled) that there was alleged fraud involved in individual cases, despite the claimants being genuinely entitled to benefits. It is difficult to determine what rebuttal evidence a claimant could present to refute the fraud allegation. The important question is whether the claimants will have the ability to refute the allegation that they themselves were involved in the fraud, or had similar fault. As mentioned above, such determinations will take place at the waiver application stage.

Because there is a strong public interest in maintaining the integrity of the criminal prosecution, and not needlessly tying-up the process of redetermining benefits, the plaintiffs have not shown likely success on their due process claim.

### 3. The Redetermination Trigger

The preponderance of the evidence determination that fraud existed was made by the OIG, which is not wholly independent of the Agency. In the criminal context, defendants do not have the ability to challenge witnesses against them at the indictment stage, even though such indictments are the result of a neutral grand jury. It stands to reason, however, that the determination of the quasi-independent OIG is sufficient in the administrative context. In addition, simply being subject to a redetermination without good cause does not violate due process. As was the case in *Eldridge*, beneficiaries are subject to routine reevaluations. The regulations at 20 C.F.R. § 404.988 provide limitations regarding when the Commissioner may reopen benefits determinations, with a general limit of four years absent any of the stated conditions. Congress is free to mandate more frequent reviews of Title II or Title XVI benefits without violating the due process rights of beneficiaries. While beneficiaries have a property

interest in their previously-awarded benefits, they do not have a constitutional interest in not being subjected to a continuing assessments of eligibility.

### 4.  Lack of a Complete Record

Griffith raises an additional due process challenge, claiming that there is no exhibit list from the initial determination attached to the redetermination.  [Pikeville Civil Action No. 7: 16-101; Record No. 15-1, p. 7]   She contends that, without the exhibit list, it would be impossible to properly evaluate on redetermination whether the initial award was supported by the record that existed at the time.   As an initial matter, this claim was not raised in her Complaint.   Her response to the motion to dismiss could be construed as an Amended Complaint, because leave to amend, as required by Fed. R. Civ. P. 15(a), is to be "freely given when justice so requires."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, because Griffith gave no indication that such was her intention, construing her response as an amended complaint would be improper.  *See Dearing v. Mahalma*, No. 1:11-CV-204, 2011 WL 3739029, at *6 (S.D. Ohio Aug. 24, 2011) (improper to construe pleading as amended complaint absent indication of *pro se* plaintiff's intention to do so).  However, even if this claim has not been waived, it otherwise fails at this stage.

Griffith failed to indicate, even generally, what evidence was absent during the redetermination.  In her reply to the motion for a preliminary injunction, Griffith alleges that "there are errors or omissions present in the 2015 exhibit list which hint at the incomplete nature of the Commissioner's reconstruction of Plaintiff's file."  [Pikeville Civil Action No. 7: 16-101; Record No. 32, p. 2] While a failure to provide a complete and accurate record is problematic, Griffith has provided only a suggestion of an incomplete record, noting

unspecified "errors or omissions" which "hint" at an incomplete record. Unspecified "hints" are not enough to demonstrate a likely success on the merits.

Griffith cites *Island Creek Coal Co. v. Holdman,* 202 F.3d 873 (6th Cir. 2000), for the proposition that an agency's failure to preserve records will violate due process. However, as later decisions have made clear, a plaintiff must show that the lost records were vital to their claims, not just that the evidence lost *hypothetically* could be helpful. *Wells v. Astrue*, No. CIV. A. 09-32-GWU, 2009 WL 5214488, at *1 (E.D. Ky. Dec. 23, 2009) (citing *Energy West Mining Company v. Oliver,* 555 F.3d 1211, 1270 (10th Cir. 2009)). And here, the Griffith's claims are hypothetical. Apart from asserting the absence of an exhibits list, and alleging misidentified exhibits in the new list, Griffith fails to allege that there was any substantive evidence from her 2008 application that was not considered during the redetermination. She makes a hypothetical claim, with the rhetorical question of "what else might be missing?"

While waived as a claim under due process, Griffith may develop this argument under her claim that the redetermination was not supported by substantial evidence. The substantial evidence claim was not raised at the preliminary injunction stage, and was not challenged in the Commissioner's partial motion to dismiss. At the preliminary injunction stage, however, these hypothetical allegations do not tend to show a likely success on the merits. Agency counsel suggested at the *Perkins* hearing that the ALJ responsible for the initial determinations in these cases failed to follow agency procedure, which makes it equally likely that the missing exhibit list is the result of one never having existed in the first place.

### ii. The Equal Protection Claim

Carter's Amended Complaint states "[t]he plaintiff seeks a declaratory judgment from the Court that the Defendant's actions described herein violated the Equal Protection Clause

of the United States Constitution." He goes on to assert that "[t]he Plaintiff is a persons [sic] receiving Social Security Disability benefits" and "[t]he Defendant has not alleged any wrongdoing by Plaintiff." [Ashland Civil Action No. 0: 16-017; Record No. 4, p. 9] Piecing the allegations together, Carter claims that having his benefits terminated in the absence of an allegation of wrongdoing violates equal protection.

The Equal Protection Clause bars "distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Mere unfair treatment does not amount to a violation of equal protection. *See Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999). The redetermination statute is generally applicable and does not single out any individual or class of individuals for disparate treatment. Neither do the Agency's rules and procedures make distinctions which burden a fundamental right or intentionally treat some individuals differently without a rational basis for the difference. To be sure, the Agency does make a distinction regarding who may challenge fraud allegations. Where fraud allegations are discovered by or referred to the Commissioner directly, and a redetermination is undertaken because of such allegations, the beneficiary is given the opportunity to challenge the fraud allegation in their hearing before an ALJ. However, when referrals are made through OIG, the Commissioner does not permit a challenge to the fraud allegation. Assuming that disability benefits or the right to challenge the evidence presented against a claimant is a fundamental right, the distinction drawn by the Agency has a rational basis. The OIG is a quasi-independent office within the Agency, and its sources of information may differ from those of the Commissioner. Therefore, it is reasonable

that the Commissioner would permit a hearing to challenge fraud allegations that arise through her office, but not those that arise through the OIG.

### iii.   The Social Security Act

Apart from their due process challenge, the plaintiffs allege that a hearing on the alleged fraud should be required as a matter of statutory interpretation.  The crux of the parties' disagreement is whether the language of the Act leaves room for the Agency to provide hearings as part of the redetermination process regarding the fraud allegations.  But because the Agency is entitled to deference in interpreting its own statutes, the plaintiffs' argument is unavailing.  Plaintiffs also argue that the Agency violated the Act by failing to take action "immediately" in making the redetermination.  But because the plaintiffs cannot demonstrate either a statutory violation or the right to a remedy for such a violation, this argument also fails.

### 1.   A Reopening versus a Redetermination

The parties do not address in detail the distinction between the reopening and the redetermination procedures.   However, the Agency contends that, under the reopening procedure, it makes a finding regarding whether a beneficiary is *currently* entitled to benefits, as opposed to only considering whether he or she was entitled at the date of his or her original grant.   As argued by the Agency here, Congress was well-aware of the procedures for reopenings at the time it passed the legislation mandating the redetermination process.  Given that the purpose of the new legislation was to create a streamlined process to cut-off fraudulently obtained benefits, and because Congress knew the reopening process was "cumbersome and unworkable," it stands to reason that it did not intend for the same process

to be utilized.[12]  Citing the same source, the plaintiffs argue that the legislative history demonstrates that Congress *did* intend a reopening to take place where there is evidence of fraud.[13]  However, the plaintiffs' contention is merely a play on words.  While the Congressional report uses the word "reopen" when it discusses the new procedures, it is clear that Congress expected a much different process than the one already in place.  The ensuing legislation, therefore, termed the new process a "redetermination."

Further, while there is little ambiguity on this point, the Commissioner's interpretation is entitled to deference.  The interpretation is expressed in Social Security Ruling 16-1p, which makes clear that "[f]raud and similar fault redeterminations under sections 205(u) and 1631(e)(7) of the Act are distinct from reopenings as described in 20 CFR 404.987 – 404.996 and 20 CFR 416.1487 – 416.1494." SSR 16-1p n.1.  Section (D)(3) of the same ruling states that "[a]n individual may appeal our finding of fraud or similar fault.  However, we will not administratively review information provided by SSA's Office of the Inspector General under section 1129(l) of the Act regarding its reason to believe that fraud was involved in the individual's application for benefits."  As the Sixth Circuit stated in *Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 557 (6th Cir. 1995), "[a]lthough social security rulings do not have the force or effect of law, we are persuaded that *Chevron* [deference] applies to social security rulings insofar as the rulings directly involve construction of the statute." *See also*

---

[12]  STAFF OF SUBCOMM. ON OVERSIGHT OF THE H. COMM. ON WAYS & MEANS, 103RD CONG., REP. ON REFORMS TO ADDRESS SUPPLEMENTAL SECURITY INCOME FRAUD AND ABUSE INVOLVING MIDDLEMEN 7-8 (Comm. Print 1994) *available at* http://congressional.proquest.com/legisinsight?id=CMP-1994-WAM-0010&type=PRINT

[13]  *Id.*

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (an agency's rulings, interpretations and opinions under its statute are entitled to deference).

Of course, the conclusion that redeterminations under sections 205(u) and 1631(e)(7) are distinct from reopenings is not expressed only in a footnote, but it is apparent also from the Social Security Administration's promulgation of distinct guidelines for the process, most notably HALLEX I-1-3-25. Additionally, the distinction between permitting hearings on fraud allegations that arise from the Commissioner, but not from the OIG, is articulated in the same section of HALLEX. Counsel for the Commissioner seemed to allege at the hearing held in Plaintiff Perkins' case that the statute *does not permit* hearings on the fraud allegations. Given that the statute does not make an express distinction between fraud allegations referred through the OIG and those arising through other means, this argument is unconvincing. Nonetheless, because the statute is silent on hearings, and, as addressed below, it stands to reason that Congress did not envision hearings on the threshold question of fraud, this interpretation is reasonable and entitled to deference.

### 2. The Effect of Delaying the Redetermination Process

The plaintiffs also claim that the OIG and the Commissioner violated the Act by failing to undertake the redeterminations "immediately." Title 42 of the United States Code, section 405(u), provides that the Commissioner is to act immediately to redetermine benefits where there is reason to believe that fraud was involved in a beneficiary's application. While the Commissioner may have had reason to believe fraud was taking place in 2006, the statutory mandate for fraud investigations is vested in the OIG. [Ashland Civil Action No. 0: 16-017; Record No. 17, p. 10] The language of 42 U.S.C. §1320a-8(l) provides that the OIG is to make information available to the Commissioner immediately when there is reason to believe fraud

has taken place, but it provides that the OIG may delay if such a referral would interfere with a pending criminal investigation. Because triggering redetermination proceedings for some 1,800 individuals would have interfered with criminal proceedings, and because §405(u) requires that the redetermination proceedings begin immediately upon notice of possible fraud, any delay in the referral period was justified here.

Many years passed between the initial accusations of wrongdoing (2007) and the initial (purported) reports to the OIG (2009), and action being taken on the redeterminations (2015). This lapse is at least partially understandable, given the process of investigating and substantiating these claims takes time, especially where internal misconduct and alleged cover-ups were involved. The statute contemplates delay so as to not interfere with criminal or civil proceedings. The plaintiffs apparently believe that, if individuals employed by the Social Security Administration were responsible for the delay by their unlawful actions, the Agency must pay the price and not be permitted to proceed. This argument fails because "the doctrine of unclean hands . . . may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest." *S.E.C. v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980).

The plaintiffs allege that there was inexcusable delay in redetermining their benefits, which prejudiced them because the lapse of time made it more difficult to present additional evidence to bolster their claims of disability. Admittedly, a more expeditious process would have benefitted all parties involved, including the public fisc. In fact, this is the very reason for the statutory command that such redeterminations be undertaken immediately. Unfortunately, the delay that the plaintiffs reference, including alleged adverse action against whistleblowers, was part-and-parcel to the fraud on which the redeterminations are based. As

held by other courts, the doctrine of unclean hands is only available against the government "where the alleged misconduct occurred during the investigation leading to the suit and the misconduct prejudiced the defendant in his defense of the action." *S.E.C. v. Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd sub nom. S.E.C. v. Calvo*, 891 F.2d 457 (2d Cir. 1989) (internal citations omitted).[14]

It may be that, for some plaintiffs, a more prompt redetermination would have made it easier to find substitute medical evidence. But if the time lapse makes it difficult or unlikely that anyone can prevail through the redetermination process, the proper remedy is through the due process clause. The statutory immediacy prescription is not a statute of limitations, but a directive tied to the purpose of the statute (i.e., the prompt termination of fraudulently obtained benefits). More expeditious redeterminations would have benefitted all parties and the public, but the plaintiffs have failed to show that the time lapse actually amounts to a violation of the statute, or that a remedy exists for such a bare statutory violation. *See Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 23–24 (1979) (to determine whether a private remedy exists in a statute "the central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action").

The plaintiffs further argue that, to excuse the delay, a written certification from the United States Attorney is required. In the present case, the Agency has not provided a written certification that proceeding with the redeterminations would hamper the ongoing criminal investigation. Regardless of whether a certification exists, it is not clear that plaintiffs would

---

[14] "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." 689 F. Supp. at 73.

have a claim because there is no evidence in the statutory language to suggest that those who received benefits through a fraudulent scheme (whether witting or unwitting participants) are the class of individual meant to be protected by the immediacy requirement. Instead, the statutory history suggests that the immediacy requirement was intended to protect the public fisc.

### 3. Other Considerations

Despite the Court's finding that Congress intended the redetermination process to be distinct from reopenings, or that the Agency's determination is entitled to deference, plaintiffs allege a hearing on the fraud allegation is required nonetheless. Counsel for Plaintiff Perkins stated at his hearing that, because Congress intends its statutes to be interpreted in a Constitutional way, it follows that a hearing on the fraud allegation must be part of the redetermination process. However, because the plaintiffs have not made the requisite showing that the absence of a hearing is constitutionally problematic, this argument is without merit.

If, as shown, Congress intended to streamline the process for terminating benefits, it is not clear that they envisioned hearings on the fraud allegations. Because the fraud allegation is the trigger for the redetermination, if beneficiaries are able to challenge the fraud allegation, it must be before the redetermination process goes forward. This is contrary to another option where beneficiaries would still be subject to a redetermination, but would be able to use otherwise excludable evidence. Therefore, the remedy to which the plaintiffs are entitled if they prevail is not a new redetermination with full evidence but, instead, is a hearing on the fraud. If plaintiffs were to prevail at such a hearing, their benefits would have to be reinstated.

Again, without reason to believe there is fraud, there is no statutory basis for the redetermination process. It would be a very cumbersome process if Congress had drafted

section 205(u) of the Act to read "where there is reason to believe fraud existed, the Commissioner shall provide the beneficiary the opportunity to rebut the fraud allegation, and if unable to rebut the fraud allegation, the Commissioner will proceed to determining benefits while disregarding all evidence that there is reason to believe is fraudulent." This is not the framework Congress put into place.

### iv.   The Administrative Procedures Act

The plaintiffs also allege that the Commissioner violated the APA because the redetermination procedures should have been subject to notice and comment rulemaking, and because the redetermination hearings should have been conducted as formal adjudications "on the record." Both arguments are without merit.

Notice and comment rulemaking is required for new rules that bind, not for interpretative rules, or for rules of an agency's organization, procedures, and practice. 5 U.S.C. § 553(b)(3)(A). Therefore, the redetermination procedures are not subject to notice and comment rulemaking.

The second APA contention regards formal adjudication. The APA establishes procedures for adjudications required by statute to be "on the record after opportunity for an agency hearing." 5 U.S.C. §554. The statute governing redeterminations, 42 U.S.C. §405(u)(1)(A), has no such requirement. Therefore, the suggestion that "on the record" adjudication is required is without merit.

Finally, the plaintiffs allege that the OIG's involvement in the redetermination process is a violation of 5 U.S.C. §554(d)'s prohibition on third party involvement in adjudications. This prohibition, as part of the rules for on-the-record adjudication, does not apply to the redeterminations. Even if redeterminations were subject to on-the-record adjudication, the

OIG did not direct the outcome or otherwise involve itself in the redetermination process. And because a separate statute mandates the referral process, this provision of §554(d) would be without effect.

### 1. On-the-Record Adjudication

Much of what the plaintiffs seek under the Due Process Clause and Social Security Act's Reopenings Procedures is also being sought under the Administrative Procedures Act; that is, the opportunity to fully present their case and present rebuttal witnesses. Because there was no formal finding of fraud, there is no argument to rebut. The requirement for formal, on the record adjudication is found at 5 U.S.C. §554. The statute prescribes specific procedures where a statute requires adjudication "on the record after opportunity for an agency hearing." The statutes governing redeterminations (i.e., 42 U.S.C. §§405(u)(1)(A) and 1383(e)(7)) do not require a hearing. Therefore, the suggestion that "on the record" adjudication is required is misplaced.

### 2. Notice and Comment Rulemaking

Notice and comment rulemaking is required for new rules that bind, not for interpretative rules, or rules of an agency's organization, procedures, and practice. 5 U.S.C. § 553(b)(3)(A). Plaintiffs allege that "if, or the extent to which they do, follow HALLEX as law, it violates and does not comport with notice and comment rulemaking." [Pikeville Civil Action No. 7: 16-101, Record No. 14, p. 10]

As the Sixth Circuit has held, "[f]or purposes of the APA, substantive rules are rules that create law. These rules usually implement existing law, imposing general, extra-statutory obligations pursuant to authority properly delegated by Congress. Interpretative rules merely clarify or explain existing law or regulations and go to what the administrative officer thinks

the statute or regulation means." *First Nat. Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1188–89 (6th Cir. 1991) (internal citations omitted). *See also Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000) (Describing HALLEX as "strictly an internal guidance tool . . . that does not carry the force and effect of law."). Because HALLEX and the Social Security Rulings do not create law, they are not subject to formal hearing requirements.

### 3. Decisions Directed by a Third Party

In pertinent part, 5 U.S.C. §554(d) states that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings." As discussed above, the formal adjudication requirements of 5 U.S.C. §554 are not applicable to the redetermination process and, therefore, neither is subsection 554(d). However, even if §554(d) were applicable, it is not clear the redetermination process would violate it, because the third party involvement is directly authorized and required by the Act.

While the OIG is not wholly independent from the Commissioner, it has no role in the decisions on whether to grant benefits apart from having made the probable cause determination. The final decision of the agency is not being directed by the OIG. Rather, it is made by an ALJ who is not subject to the supervision or the direction of the OIG. The exclusion of the problematic evidence is statutorily required.

### b. Irreparable Harm

Carter and Griffith both allege that they will suffer irreparable harm unless injunctive relief is granted because depriving an individual of income required to purchase the necessities of life "cannot be fully remedied by the belated restoration of back benefits." [Pikeville Civil

Action No. 7: 16-101, Record, No. 15-1 p.21 quoting *Day v. Shalala*, 23 F.3d 1052, 1059-60 (6th Cir. 1994); Ashland Civil Action No. 0: 16-017, Record No. 13, p. 17 (same)]  They further contend that, "[a]s the Supreme Court explained in *Goldberg*, 'termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits.'" Carter alleges that his Medicare insurance flows from this DIB payments, and Griffith argues that her Medicaid insurance flows from her SSI payments.

The Agency responds that the loss of health insurance benefits "does not constitute *per se* irreparable harm for the purposes of a preliminary injunction."  [Ashland Civil Action No. 0: 16-017; Record No. 17, p. 17 (citing *Carabillo v. ULLICO Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49, 54 (D.D.C. 2004)]  The *Carabillo* court explained that the D.C. Circuit has found *per se* irreparable injury from the loss of health benefits where a plaintiff "additionally alleges a critical need for healthcare." 355 F. Supp. 2d at 54.  Similarly, the Sixth Circuit has upheld the grant of a preliminary injunction where the loss of benefits would mean the loss of medical care to an individual requiring full-time care.  *Int'l Res., Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 302 (6th Cir. 1991) (affirming grant of injunction where son of insurance recipient required twenty-four-hour nursing care).  Neither Griffith nor Carter allege such a serious need for medical care that even the temporary loss of insurance coverage would create irreparable harm.

The Agency argues that, because the risk of wrongful termination was low, and because plaintiffs will receive retroactive relief if they prevail, and can receive current benefits if a new application is approved, irreparable harm cannot be demonstrated.  It cites *Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006), for the proposition that "[t]o demonstrate irreparable harm,

a plaintiff must show actual and imminent harm rather than harm that is speculative or unsubstantiated." *Id.* at 552 (internal quotation marks omitted). [Ashland Civil Action No. 0: 16-017, Record No. 17, p. 17; Pikeville Civil Action No. 7: 16-101, Record No. 24, p. 17]

Counsel for the Agency represented during the hearing that, because Carter now qualifies for Social Security retirement benefits, were he to apply for a waiver of overpayment, he would return to pay status. And if he were granted a waiver of overpayment, Carter would then remain in pay status. Of course, were Carter's benefits to resume in the form of retirement benefits, he would have no ongoing harm.

Counsel for the Agency at the *Perkins* hearing suggested that part of the irreparable harm allegation is erroneous deprivation of constitutional rights (namely, the ability to refute the fraud allegation). She contended that the procedural protections are sufficient such that there is no harm. While the loss of these benefits is undoubtedly a burden to the plaintiffs, they have not shown that irreparable harm is actual or imminent. In fact, given the various options available, including filing for waivers of overpayment which may lead to a full resumption of Carter's payments, and a new application which together with a waiver would put Griffith back in pay status, the plaintiffs have not demonstrated that the harm they allege is more likely than not to occur, absent an injunction.

### c. Balance of the Equities, Harm to Others, and the Public Interest

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiffs have failed to satisfy the first two factors. Nonetheless, a discussion of the public interest and balance of the equities is helpful in understanding the context of these cases.

It is only natural that the third and fourth injunction factors converge when the government is the opposing party. It would be a fool's errand to attempt to balance the potential harm to the plaintiffs (i.e., being denied what has been their primary source of income) against the potential harm to a multi-billion-dollar government fund. Even if the plaintiffs have alternate sources of income, the degree to which they are harmed will trump the potential harm of having a handful of additional persons added to the rolls as Social Security beneficiaries. Without question, the fund must be fiercely protected. There are millions of taxpayers that pay a significant amount into this fund every day. They deserve to have the fund ardently protected against those who seek to take what they are not entitled to receive. Nonetheless, individualized balancing will always weigh in favor of the individual, because the payout to a single recipient, even if not rightfully entitled, is a small percentage of the overall fund. Therefore, when the government is the non-moving party, the factors converge, and the focus shifts to what is in the public interest.

The public interest analysis is straightforward where Congress has made a value judgment, and the effect of that value judgment does not burden a constitutional right, but parties seek to enjoin the duly-enacted program or procedure from continuing. The Agency argues that "[t]he public interest lies in permitting SSA to follow the redetermination process that Congress has required." [Ashland Civil Action No. 0: 16-017, Record No. 17, p. 18; Pikeville Civil Action No. 7: 16-101, Record No. 24, p. 18] Of course, if the program Congress enacts (or as carried out by the responsible agency causes) serious constitutional concerns, the public interest does not lie in permitting it to take effect. Indeed, it is not in the public interest to deprive nearly 1,800 individuals of benefits they need (and, in the cases of Title II beneficiaries, have earned) without proper Constitutional protection. However, the plaintiffs

have failed to make a sufficient showing that the procedure in place is problematic. Further, they have failed to show that the process adopted by the Agency violates the authorizing statute or contravenes the Administrative Procedures Act.

The Agency attests that a high percentage of the individuals subjected to redetermination process have prevailed in retaining their benefits. For those that did not prevail, they are eligible to reapply (where covered status has not lapsed) and may apply for waivers of their overpayment. Here, while Carter's covered status has lapsed, he now qualifies for retirement benefits. And as an applicant under Title XVI, Griffith is eligible to reapply for benefits and has represented that she will do so.

It is in the public interest that individuals properly entitled to benefits not have them erroneously terminated. However, the plaintiffs have failed to show a sufficient likelihood of this risk. Further, in the aggregate, continued payment of wrongfully awarded DIB and SSI benefits harms the public fisc and degrades the availability of funds for those who truly deserve them. As a result, the public interest does not favor a grant of injunctive relief under the facts presented.

## IV. CONCLUSION

Carter and Griffith have failed to show that there is a substantial likelihood of success on the merits of their claims. Likewise, they have failed to show that they are likely to suffer *irreparable* harm in the absence of injunctive relief. Further, because their arguments regarding constitutional and statutory defects in the redetermination process are unconvincing, the public interest favors denial of the plaintiffs' motions. Accordingly, it is hereby

**ORDERED** as follows:

1.      Plaintiff Buster Carter's motion for a preliminary injunction [Ashland Civil Action No. 0: 16-017-DCR; Record No. 13] is **DENIED.**

2.      Plaintiff Carol Griffith's motion for a preliminary injunction [Pikeville Civil Action No. 7: 16-101-DCR; Record No. 15] is **DENIED.**

This 6th day of October, 2016.

**Signed By:**

*Danny C. Reeves*   DCR

**United States District Judge**